## KLINE *v.* LIGHTMAN

[No. 386, September Term, 1965.]

462

*Decided July 20, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, MARBURY, OPPENHEIMER and BARNES, JJ.

*James F. FitzGerald* for the appellant.

*Charles A. Dukes, Jr.,* for the appellee.

BARNES, J., delivered the opinion of the Court.

The principal question presented by the appeal is the application of Section IV (2) of the Statute of Frauds, 29 Chas. 2, Cap. 3 (1676), 2 Alexander's British Statutes (Coe's Ed.) pages 689-690, requiring a written memorandum in order to enforce a contract to answer for the debt, default or miscarriages of another person, to an oral contract between the appellant and defendant below, Joel Kline (Kline) and the appellee and plaintiff below, William R. Lightman (Lightman). The action was originally instituted in the Circuit Court for Montgomery County, but was later removed for trial to the Circuit Court for Prince George's County where it was tried before Judge Bowie and a jury. The jury rendered a verdict in favor of Lightman for $18,500. Upon the verdict final judgment was duly entered after the trial court had denied Kline's motion for a judgment n.o.v. or in the alternative, for a new trial. Kline filed a timely appeal from that judgment.

The facts are somewhat bizarre. Lightman, who had been a farmer engaged principally in raising hogs, sold his farming business and in July 1963 was desirous of entering into the busi-

ness of lending money on mortgages. He was referred to Raymond Towsend ('Towsend) by Crane Brothers (apparently some business acquaintances) who in turn introduced Lightman to Harold Rothman (Rothman), a person who was familiar with the mortgage lending business in and around Washington, D. C., and who also decided to go into that business. The three met at Towsend's office and agreed to go into the mortgage lending business together. A corporation was to be formed in which Rothman would have a 40% interest and Lightman and Towsend would each have a 30% interest. Lightman and Towsend were each to put $4,000 into the venture and Rothman was to contribute his experience and knowledge of the business. Towsend was to be inactive in the operation of the business but Lightman and Rothman were to be active and were ultimately to receive salaries. Because of Rothman's financial difficulties, it was arranged that Towsend would advance his $4,000 to Rothman, who would repay it to the new business from his prospective earnings from the business. Within a day or two, Towsend telephoned Lightman that he could not raise his $4,000 immediately, but could have it the following Tuesday. He requested Lightman to advance his $4,000 for which he would give Lightman his promissory note for that amount and would "get it back to you Tuesday." Lightman agreed to do this, drew his check to Rothman for $4,000, which Rothman endorsed and thereafter Lightman cashed and gave Rothman the $4,000 in cash. Lightman also put up his $4,000, so that at the beginning of the venture Lightman had put up $8,000.

Robert S. Zelko, a member of the Maryland Bar with offices at Silver Spring, Maryland, was employed to form a Maryland corporation known as the Public Mortgage Corporation (Public Mortgage) for which Lightman gave him his check for $100 as an advance to the business. The Articles of Incorporation were signed on August 1, 1963 by the three incorporators used by Mr. Zelko for the incorporation and were filed with and approved by the Department of Assessments and Taxation on August 13, 1963. The Articles of Incorporation provided that the total number of shares which the corporation had authority to issue was 1000 shares without par value, all of one class. There were, however, no shares issued.

Because of his financial difficulties, Rothman had caused the Montgomery Acceptance Corporation (Montgomery Acceptance) to be incorporated on January 21, 1963 to hold title to Rothman's home which was its only asset and its only activity. The house had been sold so that when the new business was started that corporation was available for any use it might have. Lightman became president and treasurer of both Public Mortgage and Montgomery Acceptance. His wife, Marie Lightman, became secretary and his brother Gene Lightman became vice president of both corporations. Apparently there were no formal meetings of boards of directors and no formal election of officers. A bank account for Public Mortgage was opened with withdrawals upon the signature of Lightman as president and treasurer.

An office at 5101 Baltimore Boulevard, Hyattsville, Maryland was rented, new furniture was purchased, and the business began to operate with Rothman as general manager. Lightman advanced from time to time a total of approximately $20,500 for the business (including the original $8,000) and performed services of the estimated value of $2,000. He shortly became quite disenchanted with the whole arrangement and after two months decided that he would no longer continue to be associated with Rothman because of Rothman's reputation and associations. The situation became so difficult that Lightman finally on September 12 or 13 gave Rothman an alternative either to "get a partner to buy me out or he would have to leave, one or the other." Lightman gave Rothman two weeks to comply and at the end of that period, on September 27, at 6:00 P.M., he asked Rothman whether he had a purchaser to buy him out, to which Rothman replied "yes; but he is not here as yet. He is on his way." Lightman then had the locks changed on the office door so that Rothman no longer had access to the office.

At approximately 7:00 P.M. on September 27, Kline telephoned Rothman and a meeting was set up at the Hot Shoppe in Silver Spring for 9:00 P.M. for Kline and Zelko, who came as *Kline's* attorney, Rothman, Lightman and Peterson, a friend of Lightman. The meeting was both protracted and stormy. It finally was transferred from the Hot Shoppe to Zelko's office at

approximately 1:00 A.M. the morning of September 28th. Lightman testified that as a result of this meeting there was an oral agreement reached on the terms of the agreement and by "3:00 o'clock in the morning everything was put down on paper which I agreed to, Mr. Kline agreed to and Mr. Rothman agreed to, and Mr. Zelko, acting at the time for Mr. Kline." The agreement was to be retyped as Mr. Zelko was not a good typist but Mr. Zelko "knew what it was, he typed it all, and we all agreed on it." After this Rothman asked "Now, is it all right if I take over the business now" to which Lightman replied "Predicated upon what is put down on the paper I am satisfied." The original writing typed by Zelko provided that Kline was to purchase Public Mortgage and Montgomery Acceptance for $22,500 of which $4,000 was to be paid down, a negotiable note for $3,500 dated November 9, 1963 was to be given to be discounted only with the approval of Kline at a bank of his choosing; there were to be 31 weekly payments of $350 each and one weekly payment of $150, making total weekly payments of $11,000 and there was to be a $4,000 final payment due 6 months from the contract date. Lightman was to turn over to Zelko, Kline's attorney, as trustee the Towsend $4,000 note and Lightman and his wife and brother were to resign as officers of Public Mortgage and Montgomery Acceptance. Lightman was also to give a release to Towsend.

By agreement, Kline's name was stricken out from the original draft and Public Mortgage and Montgomery Acceptance substituted in his place and one George Resta, an employee of Rothman, was added as a party to the contract. Rothman testified that Resta had been requested by Rothman "to be president of the company after I had concluded my deal with Mr. Lightman, and Mr. Resta agreed, and he was a complete straw. He gave his resignation as President at the time he was nominated as President. Strictly a straw party." Lightman testified that he did not know Resta but as Mr. Zelko had stated that Kline did not want his name associated with Rothman or directly with Public Mortgage "there was nothing for me to worry about as long as Joel Kline paid the money and guaranteed * * * I knew Kline was substantial, and he checked out the funds he had, and as long as he guaranteed it" Light-

man didn't care who "took it over * * * Mr. Kline was a party to the whole agreement. He was the one * * * He was satisfied and I was satisfied by him guaranteeing." He later testified "As far as I was concerned he made the contract his way, not my way, his way. His attorney stated how he wanted it so his name would not show with Public Mortgage or Rothman's name as I wanted to get away from Rothman."

The next meeting was scheduled for October 2, 1963 at the office of Public Mortgage. At this meeting Lightman, Kline, Zelko and Rothman were present as well as Henry L. Nemore, Lightman's accountant who came down from Philadelphia for the meeting. Nemore had calculated and verified Lightman's advances to Public Mortgage from the corporation's books and other records. He testified that the October 2 meeting "was to formalize the final settlement on the sale of the business by Mr. Lightman", and that "there was an agreement at that time." At that time Zelko gave his check to Lightman for $4,000. On this check appears the notation "Loan by Joel Kline to Public Mortgage Corporation and Montgomery Acceptance Corporation for payment to William Lightman." Lightman signed and delivered his releases and resignations and took the forms of releases and resignations of his wife and brother for execution by them. There were minor changes to be made in the draft of the written agreement. The guaranty form for execution by Kline recited that Lightman had sold to Public Mortgage and Montgomery Acceptance "all of the right, title and interest" of Lightman in those corporations "by an agreement dated October 2, 1963"; that part of the consideration was $4,000 to be paid on April 2, 1964; and that Kline guaranteed the payment of the $4,000 payable April 2, 1964.

Rothman testified that to him "the corporation and the individual have always been the same * * * I was dealing in the name of Harold Rothman, because Public Mortgage Company was the vehicle that I was using to speak." He further testified that he borrowed $4,000 from Kline and gave it to Zelko. "That was supposed to be the money Mr. Lightman would accept to relinquish his portion in Public Mortgage and let me operate it, and give me back the new key to the lock he had installed."

Kline testified that he had known Rothman for approximately 3 years and had made personal loans to him. In August or September 1963 Rothman owed Kline approximately $15,000 when Rothman closed down Universal Alliance Industries, a home improvement company. Rothman came to him to lend Rothman the money to "buy out Mr. Lightman's interest if they could come to some sort of agreement." He was familiar with Public Mortgage's office as he would stop in there to use the telephone when he was in the neighborhood in connection with a nearby warehouse project and "to see if I could collect any money from Mr. Rothman on previous loans." In explaining why he would lend additional money to Rothman, Kline testified:

> "I studied his past history, and many times he has made a lot of money and a lot of times he has lost a lot of money, and I was advised by many, many people not to lend him money, but I was going on a hunch, and I was trying to by keeping lending him money have him come back as before. And as of recently I understand he is doing much better, which I am sure he has been doing by his increased volume in some other corporations. * * * As a matter of fact, the money he owed me at the time of the Hot Shoppe meeting, all that money has been curtailed as of this time."

He also testified: "I figured I would go a couple more thousand to recover the first fifteen thousand." Although he could not recall whether or not Lightman turned over the new keys to the Public Mortgage office door to Rothman after the meeting of September 27-28, he did recall that Rothman was apparently operating the business when he attended the meeting at the Public Mortgage office on October 2. He has apparently kept in close touch with Rothman's operation at Public Mortgage as he testified that "last month I understand he did a quarter of a million dollars of business, which is fantastic for a small mortgage company. He wrote about 60 deals." He also said "I lend money today to Mr. Rothman only secured by mortgages." Kline testified that he was only to guarantee part

of the purchase money obligations if Lightman and Rothman reached an agreement, but no agreement was reached. Rothman testified substantially to the same effect.

On September 27, prior to the Hot Shoppe meeting, Rothman as "General Manager" of Public Mortgage signed a leasing agreement with the Metropolitan Leasing Company (Metropolitan Leasing) whereby Public Mortgage had allegedly "sold" its furniture and the chattels to Metropolitan Leasing which company (owned by Bernard S. Glassman) in turn leased them back to Public Mortgage for a term of 36 months at a monthly rental of 3.6% of the total cost of the equipment set forth in attached Exhibit A and after the 36 month period, the lease automatically renewed itself from year to year for additional terms of 1 year (12 months) duration at a monthly rental of 1% of the total costs set forth in Exhibit A.

It is significant that there are two schedules of the leased chattels, one dated September 11 in the amount of $2,196.72, the other dated September 2, 1963 in the total amount of $4,-357.30, which, together with zerox copies of the invoices showing the original selling price of the chattels, were attached to the leasing agreement. The total of the original selling price shown on the two schedules was $6,554.02. The original purchases had been made in July and August 1963. As a part of the leasing agreement and also dated September 27, 1963 was a written guarantee signed by Kline in which he guaranteed "unconditionally" to Metropolitan Leasing "the full, prompt, and faithful payment, performance and discharge" by Public Mortgage "of each of the agreements, provisions and conditions set forth in the above Lease * * *." There is an undated assignment by Metropolitan Leasing of monies due under the lease to Public National Bank.

The amount of the payment made by Metropolitan Leasing for the chattels does not appear in the record but it is clear from Kline's testimony that he either had received, or shortly after October 2, 1963, did receive the proceeds of that sale. He could not, however, recall the amount received or the precise details in regard to the transaction. He was asked the following question on cross-examination:

"Q. As a matter of fact, Mr. Kline, isn't that just exactly what happened, you put up $4,000, Public Mortgage sold the furniture to Metropolitan Leasing, you guaranteed the lease and you got your $4,000 back. Isn't that what happened?"

He replied "This may have been very true."

From the beginning of the case, Kline made it clear that he relied upon Sec. IV (2) of the Statutes of Frauds. Unfortunately counsel for Lightman took the position that a part payment or part performance of the alleged oral contract was sufficient to remove the bar of the Statute of Frauds. This theory was adopted by the trial court who charged the jury, in part, as follows:

"The Court instructs you that the law of Maryland is also, with regard to certain types of contracts, among which types are those not to be performed in one year, * * * and those holding a party to answer for the debt or obligation of another, must be in writing to be enforceable. However, one recognized exception to this rule is that if the party to be held to the contract does in fact make some actual performance under the contract, including among other acts of performance, the payment of some money due under the contract, the contract is taken from the Statute of Frauds and the oral contract may be proved and enforced."

This portion of the charge was excepted to by counsel for Kline and, in our opinion, this portion of the charge was erroneous and prejudicial to Kline. We must reverse the judgment because of this error and remand the case for a new trial.

The original Statute of Frauds, 29 Chas. 2, Cap. 3 was passed by Parliament and approved by King Charles II in 1676. It became effective in Great Britain and in the colonies, including Maryland on and after June 24, 1677, and, except for certain minor statutory modifications in the Seventeenth Section of the original statute in regard to the sale of goods, by the Uniform Sales Act and the Uniform Commercial Code, has remained effective in its original form in Maryland since its effec-

tive date. Section IV, subparagraph (2), which is the relevant section of the statute in the present case, has been continued unchanged and provides as follows:

"IV. * * * no Action shall be brought * * * (2) or whereby to charge the Defendant upon any special Promise to answer for the Debt, Default or Miscarriages of another Person * * * unless the Agreement upon which such Action shall be brought, or some *Memorandum* or Note thereof shall be in Writing, and signed by the Party to be charged therewith, or some other Person thereunto by him lawfully authorized." 2 Alexander's British Statutes (Coe's Ed.) page 690.

The provisions of the Statute of Frauds were continued in Maryland after the American Revolution by virtue of the provision of the Constitution of 1776, which has been continued in subsequent constitutions of this State, that the inhabitants of Maryland are entitled to the common law of England and to the benefit of such English statutes as existed on July 4, 1776 which by experience have been found applicable to local circumstances and which have been "introduced, used and practiced" by the courts of law and equity. See Constitution of Maryland, 1867, Declaration of Rights, Article 5.

By the provisions of Code (1957) Art. 35, §36, the *consideration* for a special promise to answer for the debt, default or miscarriage of another person need not be in writing. See *Ledford Construction Co. v. Smith,* 231 Md. 596, 191 A. 2d 587 (1963).

The Seventeenth Section of the Statute of Frauds in regard to the sale of goods, wares and merchandise of the value of five pounds sterling or upwards did provide by its terms that part payment or part delivery would remove the transaction from the provisions of the Statute of Frauds, but it is well established in Maryland and in the great majority of other jurisdictions that part payment or part performance of themselves did not *at law* remove transactions involving the other sections of the statute from its requirement of a memorandum in writing. The courts of equity have enforced certain oral contracts otherwise not enforceable because of the requirements of the Statute

of Frauds when there has been a part performance of the oral contract, but this is a doctrine of purely equitable origin and is surrounded by certain safeguards in respect to clear and definite proof of the part performance which must furnish evidence of the oral contract itself and must point unequivocally to the particular contract sued upon. See *Serio v. Von Nordeck,* 189 Md. 388, 56 A. 2d 41 (1947); *In re Ford,* 40 F. Supp. 955 (D. Md. 1941) and *Miller on Equity Procedure,* §703.

In Maryland our predecessors held in *Hamilton v. Thirston,* 93 Md. 213, 48 Atl. 709 (1901) and in subsequent cases, that the doctrine of part payment or part performance only applied where applicable in equity and not at law. We cited *Thirston* with approval and followed it in *Cline v. Fountain Rock Lime & Brick Co., Inc.* 210 Md. 78, 88, 122 A. 2d 449 (1956) and quite recently in *Mangione v. Braverman,* 234 Md. 357, 360, 199 A. 2d 225 (1964), and in *Stevens v. Bennett,* 234 Md. 348, 352, 199 A. 2d 221 (1964).

As the present case is clearly an action at law, the lower court erroneously instructed the jury that if it found that there had been some actual performance under the contract, including a part payment, the contract is taken from the Statute of Frauds and the oral contract could be proved and enforced.

It is equally well settled in Maryland and by the great weight of authority generally that if the oral promise is to be made by the defendant to serve some purpose *of his own* rather than to answer for the debt, default or miscarriage *of another person,* such an oral promise is not within Section IV, Subsection (2) of the Statute of Frauds. Judge Delaplaine, for the Court, in *Crown Realty Corporation v. Weinstein,* 177 Md. 260, 9 A. 2d 602 (1939) stated the "main purpose" or "leading purpose" rule as follows:

> "The question in this case is whether the alleged promise of the appellant was collateral, and therefore within the Statute of Frauds, or whether it was original and enforceable. It is frequently difficult to determine, merely from the words in which a promise has been made, whether the undertaking is collateral to an

engagement of liability or an original undertaking. In deciding this question, the situation of the parties and all the surrounding circumstances should be considered. In other words, the test in determining whether an undertaking is collateral or original is whether the promise was in fact made and intended as collateral or as original. *27 C.J., Statute of Frauds,* sec. 20; *Brantly on Contracts,* sec. 55.

"It is well established that whenever the main purpose of the promisor is to subserve some pecuniary or business purpose of his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability. *Elder v. Warfield,* 7 H. & H. 391; *Small v. Schaefer,* 24 Md. 143; *Davis v. Patrick,* 141 U. S. 479, 12 S. Ct. 58, 35 L.Ed. 826. Thus, where there is a new and superadded consideration for the promise, moving between the party promising and the party to whom the promise is made, and distinct from the original liability, the promise is original." (Page 263 of 177 Md.; page 603 of 9 A. 2d).

See also *Mangione v. Braverman, supra,* at page 361 of 234 Md. and page 227 of 199 A. 2d.

There was much evidence in the case at bar from which the jury might well have concluded that Kline's oral promise, although in the form of a "guarantee" of the payments to Lightman was in substance and in fact a promise to serve a purpose of his own so that the "main purpose" or "leading purpose"[1] rule was applicable and the oral contract would not be subject to the Statute of Frauds. Kline's own testimony that he was willing to put up money for Rothman "on the hunch" that Rothman could successfully operate the business and be enabled to repay Kline the $15,000 Rothman owed him, Kline's dominant role in the sale and lease back of the Public Mortgage

---

[1]. Professor Corbin refers to the rule as the "Leading Purpose Rule". See 2 Corbin on Contracts, §347, page 215 et seq.

chattels, his payment of the $4,000 through his attorney to Lightman, Kline's familiarity with Rothman's operation and his continued lending of money to Rothman on mortgages from transactions of Public Mortgage, Lightman's refusal to deal with Rothman and his sole reliance upon the credit of Kline,[2] the surrender of the business to Rothman in reliance on Kline's oral promise, and the other testimony already set forth would clearly support a jury's verdict (if the jury so determined) in favor of Lightman based upon a proper instruction of the law applicable by the "main purpose" rule.

We have considered whether or not Kline suffered any prejudice from the failure of the trial court to instruct the jury in regard to the "main purpose" doctrine and in giving the instructions already above set forth, on the theory that the trial court should possibly have directed a verdict for the plaintiff upon the application of the main purpose doctrine as a matter of law. We have concluded, however, that in view of the testimony of Kline and Rothman that the intention of the parties was to have a collateral promise from Kline as well as the form of the transaction as ultimately redrafted by Kline's attorney, there was more than a mere scintilla of evidence presented in support of Kline's theory of the case and the issues of fact thus presented should be submitted to the jury upon the new trial.

Lightman urges upon us that the evidence conclusively establishes that Kline is estopped by his oral promise, his conduct and the reliance of Lightman upon the oral promise and conduct with a change in Lightman's position to his prejudice by turning over the business to Rothman. It is well established that there may be an estoppel raised to prevent a defendant from relying upon a right of property, of contract or of remedy both at law or in equity. *Solomon's Marina v. Rogers,* 221 Md. 194, 198, 156 A. 2d 432 (1959) ; *Fitch v. Double "U" Sales Corp.,* 212 Md. 324, 335, 129 A. 2d 93 (1956).

---

2. The sole reliance on the credit of Kline and Lightman's refusal to deal with Rothman or to rely on Rothman's credit is, in itself, strong evidence that the transaction with Kline involved an "original" rather than a "collateral" promise and that the oral promise was not within the purview of the Statute of Frauds. Crown Realty Co. v. Weinstein, supra. And see 2 Corbin on Contracts, §353, page 234, note 77.

Conduct sufficient to create an equitable estoppel can bar one from asserting the defense of the statute of frauds to an oral contract otherwise within its provisions. *Hurst v. Thomas,* 265 Ala. 398, 91 So. 2d 692 (1956) ; *Citizens Oil Co. v. Head,* 201 Ga. 542, 40 S. E. 2d 559 (1946) ; *Dupree v. Moore,* 227 N. C. 626, 44 S. E. 2d 37 (1947) ; *Polka v. May,* 383 Pa. 80, 118 A. 2d 154 (1955) ; *Webb v. Shultz,* 184 Tenn. 235, 198 S. W. 2d 333 (1946). It has been held that one may be estopped to assert defects or objections affecting the enforceability of contracts of guarantee. See *S. P. Weaver Lumber & Supply Co. v. Price,* 205 La. 678, 17 So. 2d 917 (1944) ; *Baird v. Stephan,* 52 N. D. 568, 204 N. W. 188 (1925) ; *J. R. Watkins Co. v. Harrison,* 31 Ga. App. 270, 120 S. E. 432 (1923).

Here again, although the evidence is rather compelling in this regard, we have concluded that there was more than a mere scintilla of evidence to support Kline's theory which would require the issue of estoppel to be submitted to the jury under appropriate instructions by the court in regard to the theory of estoppel. As no such instruction was requested by counsel for Lightman or given to the jury by the lower court and no exception taken by Lightman for failing to give such an instruction, the issue is not properly before us. Maryland Rule 885.[3] As the case must be remanded for a new trial, any issues based on estoppel may be considered by the lower court and if appropriate, presented to the jury at the new trial.

Kline contends that the transaction was in essence one for the purchase by Public Mortgage and Montgomery Acceptance of their own stock and that at the time of the alleged breach, these corporations were insolvent; hence the transaction was illegal by virtue of Code (1957) Art. 23, §32(c) which provides:

> "(c) *Effect of insolvency of corporation.* No corporation of this State may redeem or acquire for value

---

**3.** The question of estoppel was discussed in Lightman's memorandum in the trial court in opposition to Kline's motion for judgment n.o.v. or, in the alternative for a new trial, that memorandum being almost identical to Lightman's brief in this Court. As issues of fact were involved, an instruction in regard to estoppel should have been presented for the trial court's consideration before the jury retired, rather than after the verdict.

any shares of its own stock when it is insolvent or when the effect of such redemption or acquisition would be to render it insolvent. For the purposes of this section, a corporation shall be deemed to be insolvent if its debts exceed its assets taken at a fair valuation or if it is unable to meet its debts as they mature in the usual course of business."

In our opinion, the trial court properly declined to grant Kline's requested instructions in this regard as the evidence established that no corporate stock had been issued for Public Mortgage or that Lightman held any stock in either Public Mortgage or Montgomery Acceptance. The purchase was of Lightman's interest in the business which included Public Mortgage's debt to him of approximately $22,500. Nemore, the accountant, testified without contradiction, that the elimination of this debt would render Public Mortgage entirely solvent. Under these circumstances the provisions of Article 23, §32(c) do not apply.

The final contention of Kline is that the trial court erred in overruling Kline's demurrer to Lightman's original declaration, as particularized, and further that there was, in any event, a fatal variance between the pleadings and the proof. This contention is based on the theory that the allegation of the original and amended declarations, as particularized, show on their face that Lightman intended to charge Kline with an oral contract to answer for the debt of another person.

Kline's demurrer, filed on March 26, 1964, was to the original declaration filed December 18, 1963 as particularized by the bill of particulars filed on March 17, 1964, after Lightman's exceptions to the demand for particulars had been overruled by Judge Shure, and by Lightman's answer to Kline's demand for the production of a written instrument filed March 24, 1964. By Lightman's answer to Kline's demand for production of a written document, it was stated that "there is no written document, signed by the parties, which represents the contract, sued upon herein. The contract was reduced partially to writing by the attorney for the defendant, but the draft was never in full accord with the intent of the parties and was not signed. Plaintiff relies on an oral contract, removed from the Statute of

Frauds by a substantial, partial payment of consideration by the defendant, as alleged in the Declaration." There was no demurrer to the declaration as particularized by an amended bill of particulars filed May 19, 1965 or as amended by permission granted by the trial court in open court to increase the amount of the *ad damnum* clause from $11,500 to $18,500.

The declaration contained three counts, two common counts for goods sold and delivered and goods bargained and sold and a special count which alleged a portion of the facts in regard to the contract of October 2, 1963. It was alleged in count 3 that on or about October 2, 1963 Kline "did bargain for and contract to buy all of the capital stock and interest" of Lightman in Public Mortgage and Montgomery Acceptance, "or, in the alternative, the defendant did bargain and contract to guarantee the payment of certain portions of the consideration to plaintiff in exchange for his stock in the companies in a contract to purchase all of the plaintiff's stock and interest in the companies by the companies themselves." Then follow various allegations in regard to the payment of the $4,000, the execution of the release by Lightman and the release of the Towsend note for $4,000. The bill of particulars filed by Lightman gave the details of the contract of October 2, 1963 which were in error in regard to the amount of payments under it. These were stated to amount to $11,000 instead of $18,500. As we have indicated this was corrected in the amended bill of particulars filed with the permission of the trial court, and the *ad damnum* clause in the declaration was amended to claim $18,500 in open court prior to trial.

In the demurrer to the declaration as particularized Kline set forth the following reasons:

> "1. That the said declaration shows that all moneys promised by the Defendant Kline have been paid by him.
> "2. That the pleadings heretofore filed herein show on their face that there was no meeting of minds between the parties hereto.
> "3. And for such other and further reason that may be advanced at hearing hereon."

Maryland Rule 345 b requires that the demurrer set out specifically the reasons for the demurrer and it is clear that the two specific reasons alleged by Kline did not justify the trial court in sustaining the demurrer and these grounds are not relied on in this Court. The third "reason" is a mere general allegation which does not comply with the requirements of Maryland Rule 345 b. After the demurrer was overruled, Kline filed three pleas—two general issue pleas, i.e., that he was not indebted as alleged and that he did not promise as alleged and a third plea that "the defendant denies the execution of a written contract between the parties hereto, on or about October 2, 1963 or at any other time."

2 *Corbin on Contracts*, §318, page 143 states:

> "A complaint or declaration upon a contract within the statute of frauds is not demurrable merely because it does not allege that the requirements of the statute have been satisfied. This is true even though the view is taken, as is done in this book, that the statute lays down a rule of substantive law making a written memorandum one of the operative facts for the enforcement of a contract. Other factors may be sufficient substitutes for a writing. The rules of pleading do not require the affirmative allegation by the plaintiff of all of the ultimate operative facts constituting his cause of action. An averment that a contract has been made is an allegation both of fact and of law. The exact words used by the defendant need not be set out. In this respect there is no difference between cases where the contract is within the statute of frauds and cases where it is not."

See *Hamilton v. Thirston, supra,* at page 220 of 93 Md., and *Poe* on *Pleading,* §564, page 584. See also *West v. Day Trust Co.,* 328 Mass. 381, 103 N. E. 2d 813 (1952); *De Vincent Ford Sales, Inc. v. First Mass. Corp.,* 336 Mass. 448, 146 N. E. 2d 492 (1957); *Herring v. Volume Merchandise, Inc.,* 249 N. C. 221, 106 S. E. 2d 197 (1958); *Black Eagle Oil Co. v. Globe Oil & Refining Co.,* 3 Wis. 2d 340, 88 N. W. 2d 684 (1958).

In any event, in our opinion, the declaration as particularized

by the bill of particulars and by the answer to Kline's motion for the production of documents stated sufficient facts to advise the defendant Kline of the nature and substance of the plaintiff's claim and this complied with the requirements of Maryland Rules 301 c and 345 c which provide:

Rule 301 c. *"Clear Statement Sufficient.*

Any pleading which contains a clear statement of the facts necessary to constitute a cause of action or ground of defense shall be without reference to mere form, and it shall not be necessary to state time or place in a pleading except where time or place forms a part of the cause of action or ground of defense."

Rule 345 c. *"No Demurrer for Informality—Proviso.*

A demurrer shall not be allowed for a mere informal statement of a cause of action or defense, provided such statement is sufficient in substance."

Kline made no motion to strike out any testimony on the ground of any alleged variance between the pleadings and the proof. In the absence of such a motion, we will not consider the question on appeal. Maryland Rule 885.

If there had been such a motion and any substantial variance between the pleadings and proof appears (which we do not suggest was the situation in the present case), the trial court would doubtless have given Lightman leave to amend the pleadings to conform to the proof under the broad provisions of Maryland Rule 320.

*Judgment reversed, and the case remanded for a new trial, the costs in the lower court and in this Court to abide the result of the new trial.*