**HERITAGE OLDSMOBILE–IMPORTS, et al.**

v.

**VOLKSWAGEN OF AMERICA, INC.**

**No. CIV. JFM–02–3230.**

United States District Court,
D. Maryland.

March 24, 2003.

Richard N. Sox, Walter D. Moody, Jr., Myers and Fuller, PA, Tallahassee, FL, Stephen C. Winter, Miles and Stockbridge, Towson, MD, for Plaintiffs.

Philip M. Andrews, Kramon & Graham, P.A., Baltimore, MD, James R. Vogler, K. Alexander Schmidt, Randall L. Oyler, Barack Ferrazzano Kirschbaum, Perlman and Nagelberg LLC, Chicago, IL, for Defendant.

## MEMORANDUM

MOTZ, District Judge.

Plaintiffs, Heritage Oldsmobile–Imports, Inc. ("Heritage"), Valley Motors, Inc. ("Valley Motors"), and Russell Motor Cars, Inc. ("Russell") has filed this diversity action against Volkswagen of America, Inc. ("VW"). The action arises out of VW's decision to activate a new dealership in the Baltimore market. VW has filed a motion to dismiss. Plaintiffs' claims for breach of oral contract and fraudulent misrepresentation will be dismissed with leave to amend. Plaintiffs' remaining counts will be dismissed without leave to amend.

### I.

Each plaintiff is an automobile dealer that sells Volkswagen automobiles and parts in the Baltimore area pursuant to a Volkswagen Dealer Agreement (the "Agreement"). Under this Agreement, the dealer assumes responsibility for the

promotion and sale of Volkswagen products in the "dealer's area." (Compl., Ex. A, Art. 2(1).) Performance is evaluated by VW based on the sale of products within the dealer's area; however, the Agreement "does not give Dealer any exclusive right to sell or service [Volkswagen products] in any area or territory." (*Id.*)

Plaintiffs claim that in 2000 VW lobbied each of the plaintiffs to perform substantial renovations of their premises to meet the "Marketplace Program" recently implemented by VW.[1] (Compl.¶ 10.) The dealers claim, and VW does not dispute for purposes of this motion, that the dealers were under no obligation to make the requested changes to their facilities. (Pl.'s Resp. at 1.) Sometime during negotiations with each of the dealers, it is alleged that VW promised it would not reactivate its downtown Baltimore "open point" if the dealers would agree to invest in the renovation of their facilities.[2] (Compl.¶ 10.) Each of the plaintiffs eventually invested substantial sums to comply with the new "Marketplace Program."[3] (Compl.¶ 11.)

After renovating their facilities, plaintiffs learned that VW intended to activate the Baltimore open point. (Compl.¶ 12.) To prevent this, plaintiffs filed suit. In Count I, plaintiffs request temporary and permanent injunctive relief. Count II claims that VW breached its contract with the dealers by failing to review the dealers' performance on a quarterly basis, resulting in VW's decision to reactivate the Baltimore open point. Counts III and IV assert that VW violated two provisions of the Transportation Article of the Maryland

Code—the first provision requires good faith in any transaction or conduct governed by the Transportation Article, and the second provision requires the fair, reasonable, and equitable application of performance standards. Count V alleges VW breached oral agreements not to activate the Baltimore open point if the dealers would renovate to meet the standards of the "Marketplace Program." Finally, Counts VI and VII respectively allege that plaintiffs were the victims of VW's negligent or fraudulent misrepresentations concerning the open point.

## II.

### A. Violations of the Transportation Article (Counts III & IV)

Consideration of plaintiffs' claims under the Transportation Article necessarily begins with the decision of the Maryland Court of Special Appeals in *Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc.*, 117 Md.App. 290, 699 A.2d 1209 (1997). In *Antwerpen*, the plaintiff auto dealer, Herb Gordon Auto World, Inc. ("Herb Gordon"), was unhappy with Chrysler's decision to award a dealership in the area to another dealer. *See id.* at 1212. Like the plaintiffs in this case, Herb Gordon had invested substantial sums to improve its facilities based partly on a representation that an open point would not be reactivated. *See id.* at 1212–13. In a suit based, *inter alia*, on Chrysler's violation of the Transportation Article, Herb Gordon sought monetary damages and injunctive relief to prevent the new dealer-

---

1. Plaintiffs mistakenly refer to the "Marketplace Program" as the "Image Program"—possibly a reference to a similar program implemented by GM.

2. An "open point" is a specific market location set aside by a manufacturer for the appointment of a new dealer. The Baltimore

open point had been inactive for several years.

3. Heritage incurred expenses of approximately $1,300,000; Valley Motors spent approximately $1,000,000; and Russell spent nearly $3,000,000.

ship from opening.[4] The trial court granted the injunction.

On appeal, assessing the factor of Gordon's likelihood of success on the merits, the Court of Special Appeals concluded that the provision of the Transportation Article prohibiting dealer coercion, § 15–207(d)(2), relied upon by Herb Gordon, did not apply and could not be used to challenge the establishment of a new dealership. The court noted that other states have enacted Relevant Market Area (RMA)[5] statutes designed to circumscribe a manufacturer's ability to establish or relocate dealerships. *See id.* at 1220. An RMA statute had been considered by the Maryland legislature, but never enacted. *See id.* Against this background and finding that the express statutory language provided no basis for Herb Gordon's claim, the Court of Special Appeals reversed. *See id.*

Plaintiffs first attempt to distinguish *Antwerpen* by emphasizing that they are seeking monetary damages as well as injunctive relief. In *Antwerpen* the Court of Special Appeals' addressed only the preliminary injunction that Herb Gordon had obtained. Indeed, the court explicitly noted that it was expressing "no opinion on the viability of Herb Gordon's action for damages under the various theories contained in the complaint." *See Antwerpen,* 699 A.2d at 1218 n. 8. Nevertheless, the court's reasoning applies as equally to a claim for monetary damages as it does to a claim for injunctive relief. Plaintiffs have suggested—and I can discern—no principled basis for distinguishing between the two.

■ Second, plaintiffs point out that they are relying upon provisions of the Transportation Article different from those relied upon by Herb Gordon: section 15–207(e) and section 15–206.1. Section 15–207(e) prevents a dealer from applying performance standards unevenly between similarly situated dealers and requires the application of performance standards to be fair, reasonable, equitable, and based on accurate information.[6] *See* Md.Code Ann., Transp. II § 15–207(e). This subsection of § 15–207 is no more applicable to the claims asserted by plaintiffs in the present case than was § 15–207(d) in *Antwerpen.*

---

**4.** Herb Gordon also asserted a breach of contract claim that the Court of Special Appeals found to be unavailing.

**5.** An RMA statute prevents a manufacturer from establishing a new dealership in the relevant market without providing notice and establishing good cause. The statutes generally provide a mechanism for protesting a decision to relocate or establish a new dealership. *See, e.g., In re Kerry Ford, Inc.,* 106 Ohio App.3d 643, 666 N.E.2d 1157, 1159–62 (1995) (citing Ohio's RMA).

**6.** Section 15–207(e) reads:
(e) *Performance standards.*—(1) A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, or representative, may not require or coerce a dealer to adhere to performance standards that are not applied uniformly to other similarly situated dealers.

(2) A performance standard or program for measuring dealership performance that may have a material effect on a dealer and the application of the standard or program by a manufacturer, distributor, or factory branch shall be fair, reasonable, equitable, and based on accurate information.
(3) (i) If the performance standard is based on a survey, it must be shown that:
    1. The survey was designed with experts;
    2. The proper universe was examined;
    3. A representative sample was chosen; and
    4. The data was accurately reported.
(ii) The manufacturer, distributor, or factory branch shall establish the objectivity of the survey process and provide this information to any dealer of the same line make covered by the survey on request.
Md.Code Ann., Transp. II § 15–207(e).

VW did not apply performance standards in making its decision to reactivate the open point, and nothing in the Transportation Article requires it to do so prior to making such a decision. *See Antwerpen,* 699 A.2d at 1220. According to plaintiffs' complaint, VW's decision to activate this open point was based on an arbitrary choice to award a certain number of new dealerships nationwide. (Compl. at ¶ 37.) It did not evaluate the performance of the existing dealerships in making this decision, so it could not have applied the performance standards unfairly. More importantly, VW was not required to apply such standards or show good cause before reactivating the open point. As *Antwerpen* makes clear, the Transportation Article does not contain an RMA provision that would require such action. *See Antwerpen,* 699 A.2d at 1220.

■ *Antwerpen* also disposes of plaintiffs' claim regarding VW's alleged violation of § 15–206.1, the "good faith" provision of the Transportation Article. By its terms, section 15–206.1 requires good faith in acting under the "terms, provisions, or conditions of any franchise agreement" or "[i]n any transaction or conduct governed by this subtitle." There is no portion of the Agreement that covers a manufacturer's decision to offer a new dealership to another entity. (*See* Compl., Ex. A.) Therefore, VW was not acting under "the terms, provisions, or conditions of a franchise agreement" when it decided to reactivate the open point. Likewise, as *Antwerpen* makes clear, establishing a new dealership is not circumscribed by an RMA statute in the Transportation Article. *See Antwerpen,* 699 A.2d at 1220. Such an

act is therefore not a "transaction or conduct governed by" that subtitle.

## B. Breach of the Written Contract (Count II)

■ In support of their claim for breach of the written contract, plaintiffs cite the section of the Agreement requiring VW to meet with each of them regularly to discuss dealer performance.[7] (Compl. ¶ 23 & Ex. A, Art. 11.) It is alleged the "custom and practice" of VW and other manufacturers is to identify problems or deficiencies in a particular market and give the existing dealers in that market a chance to rectify the situation prior to opening a new dealership (or in this case, prior to reactivating an open point). (Pl.'s Resp. at 12.) These quarterly reviews would normally provide the manufacturer an opportunity to bring any problems or deficiencies to the dealers' attention. Plaintiffs claim VW's failure to conduct these reviews resulted in the decision to reactivate the Baltimore open point.

■ Plaintiff's breach of contract claim lacks a causal connection. Assuming (as appropriate on a motion to dismiss) that VW has failed to review dealer performance on a quarterly basis, there is no connection between this "breach" of the contract and the decision to reactivate the open point. *See Stone v. Chicago Title Ins. Co. of Maryland,* 330 Md. 329, 624 A.2d 496, 502 (1993) ("[D]amages sought must arise naturally from breach of contract itself or must have been reasonably within contemplation of parties at the time the contract was entered"). VW does not need to establish a valid reason for open-

7. Plaintiffs contend VW must conduct performance reviews "at least quarterly." (Compl.¶ 23.) The Agreement says VW must conduct these reviews at least annually and *may* evaluate dealer performance during the year through periodic reviews. (*See* Compl., Ex. A, Art. 11(1).) Though I see no provision of the Agreement calling for quarterly reviews, the frequency of these reviews is not relevant to my determination with respect to the written contract.

ing a new dealership or give the dealers a chance to "fix" the deficiencies VW perceives in the market. *See Antwerpen*, 699 A.2d at 1220. No state law requires such action, and nothing in the contract specifically creates such an obligation.[8] It may be "custom and practice" in the industry to discuss such problems quarterly and to provide an opportunity to rectify problems. Custom and practice, however, may only be used to interpret the terms of an ambiguous or deficient contract—not to contradict the terms of the contract or create an obligation absent from the contract. *See Applestein v. Royal Realty Corp.*, 181 Md. 171, 28 A.2d 830, 831 (1942) ("The true test is that there must be in the contract something doubtful that can be explained by usage or custom. If the contract is plain, evidence cannot be received to contradict it.") Plaintiffs here have not identified any material contract provision of uncertain meaning.

## C. Breach of the Oral Agreement (Count V)

Plaintiffs claim that each of them reached an oral agreement with VW whereby the dealer would renovate its facilities if VW would not reactivate the Baltimore open point. As presently stated, their claim fails because enforcement of the oral contracts alleged is barred by the statute of frauds. However, in their opposition brief, plaintiffs have re-characterized their allegations regarding the oral contracts; as re-characterized, these contracts do not fall within the proscription of the

statute of frauds. Therefore, Count V will be dismissed but plaintiffs will be granted leave to amend their oral contract claim.

■ The statute of frauds does not apply to an oral contract if it is possible for the contract to be performed within a year. *See Gen. Federal Constr., Inc. v. James A. Federline, Inc.*, 283 Md. 691, 393 A.2d 188, 190 (1978). According to the averments in the complaint, under the oral contract alleged by plaintiffs VW "expressly promised the Plaintiffs that it would not reactivate the Open Point in the Baltimore Metro area." (Compl.¶ 43.) This promise is one of indefinite duration (VW allegedly agreed to abstain from reactivating the open point forever) and could not be performed within a year. At the end of the first year, the open point would remain inactive, but performance would not be complete.

■ In their brief responding to VW's motion to dismiss, plaintiffs have made a subtle, but critical, change to their claim. To convert the alleged oral agreements to ones that could be performed within a year, plaintiffs now argue that VW agreed it would terminate its right to reactivate the Baltimore open point. (*See* Pl.'s Resp. at 7.) If VW agreed to relinquish its right to reactivate the open point after plaintiffs had completed renovations, plaintiffs argue, termination of the right would be immediate and could be accomplished within one year of the contract date.

8. Plaintiffs claim it is the "custom and practice" of VW, on a nationwide basis, to substantiate and document the need for a dealership prior to activating an open point. If VW's custom and practice is to be considered at all (and it need not be in this case because the contract is not ambiguous or deficient with respect to this point), then the custom and practice cannot be considered in a vacuum. VW's custom and practice with respect to establishing a new dealership may be quite different in a state with an RMA statute as compared to a state without one—such as Maryland. A custom or practice that developed in another state as a direct result of a statutory law that has been specifically rejected by the Maryland legislature would have little bearing on the interpretation of a contract in Maryland.

It is unseemly that plaintiffs have changed their position about the substance of their oral agreements with VW in order to bolster their legal position. Their original allegations draw into question the veracity of their present allegations and can be used to impeach whatever sworn testimony they give in the future. *See, e.g., Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir.1989). However, the law does draw a distinction between a promise never to do something and a promise to extinguish one's right to do something. The distinction is critical in analyzing a claim with respect to the statute of frauds. *See, e.g., Federline*, 393 A.2d at 190–92 (collecting cases). Therefore, plaintiffs will be permitted to amend the complaint to make their modified allegation as to what their alleged oral agreement with VW was, provided they can do so in good faith.[9]

Plaintiffs also argue that the doctrine of part performance prevents application of the statute of frauds. A plaintiff in Maryland may effectively prevent a defendant from using the statute of frauds as a shield if the plaintiff can show it has substantially performed its part of the alleged oral agreement and plaintiff's performance evinces a clear indication of the existence of the agreement. *See Unitas v. Temple*, 314 Md. 689, 552 A.2d 1285, 1291–94 (Md.1989). Performance evidences a clear indication of an agreement if plaintiff's performance can be explained only by the existence of the oral agreement. *See id.; Beall v. Beall*, 291 Md. 224, 434 A.2d 1015, 1019 (1981). Here, if plaintiffs had no legal obligation to make the renovations under the current operating agreement, plaintiffs might be able to establish they would not have renovated their facilities but for the oral agreement they had allegedly reached with VW. *Cf. Collins v. Morris*, 122 Md.App. 764, 716 A.2d 384, 390–91 (Md.1998) (holding plaintiff's possession of premises and regular payments for four years were consistent only with the existence of a contract to purchase the property). However, if plaintiffs intend to pursue this theory, they must amend their complaint to allege unequivocally that they would not have renovated their facilities *but for* the oral contract with VW.[10] *See generally Mann v. White Marsh Properties, Inc.*, 321 Md. 111, 581 A.2d 819, 822 (1990) ("The Statute of Frauds is not satisfied by part performance based upon acts that are equivocal as to the existence of a contract.")

## D. Negligent and Fraudulent Misrepresentation (Counts VI & VII)

Plaintiffs allege they were victims of VW's negligent or fraudulent misrepresentations. Under Maryland law, a negligent misrepresentation claim has five elements: (a) defendant, owing a duty of care to plaintiff, negligently asserts a false

---

9. Plaintiffs alternatively claim that VW is equitably estopped from asserting the statute of frauds. This claim adds nothing to their position. "In order to claim the benefit of an equitable estoppel, the party asserting the estoppel must have acted in good faith and with reasonable diligence." *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 545 (4th Cir.1987) (construing Maryland law). As a matter of law, it would be unreasonable for a party (particularly a sophisticated party, like each of the plaintiffs) to spend millions of dollars to renovate its facilities in reliance upon a promise unenforceable under the statute of frauds and expect to recover monetary damages for breach of the promise. To permit the doctrine of equitable estoppel to apply under such circumstances would undermine the statute of frauds and the policies it is designed to promote.

10. In addition, only an equitable remedy is available under a theory of part performance. *See Kline v. Lightman*, 243 Md. 460, 221 A.2d 675, 682 (1966).

statement; (b) defendant intends that plaintiff will act on the statement; (c) defendant knows that plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (d) plaintiff justifiably takes action in reliance on the statement; (e) proximately causing damages to plaintiff. *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534, 539 (1982).

■■■ VW argues that a representation regarding future conduct of the party making the representation, essentially a promise, is not actionable under a theory of negligent misrepresentation. VW is correct. In response, plaintiffs cite a case in which the Maryland Court of Special Appeals held that a predictive statement of future events could be actionable as a negligent misrepresentation if the party making the prediction or estimate held themselves out as knowledgeable in a particular field. *See Cooper v. Berkshire Life Ins. Co.,* 148 Md.App. 41, 810 A.2d 1045, 1063–64 (2002). From that proposition, plaintiffs extrapolate that VW is knowledgeable regarding its future conduct, thereby making its alleged statement to plaintiffs about not reactivating the open point actionable as a negligent misrepresentation. Plaintiffs fail to note, however, that in *Cooper* the court expressly "recognized the difference between a promise of future events and an estimate by one knowledgeable in a particular field." *Id.* at 1064. The latter is actionable, while the former is not (with one notable exception, discussed below). *See id.* The alleged representation that VW would not reactivate the open point falls into the "promise" category. For this reason, claim for negligent misrepresentation will be dismissed without leave to amend.

■■■ Application of the exception to the general rule mentioned above converts plaintiffs' negligent misrepresentation claim into a claim for fraudulent misrepre-

sentation. In order for a negligent misrepresentation claim based upon a promise of future conduct to be actionable, the party making the representation regarding its future conduct must know, at the time it makes the representation, that it does not intend to carry out the promise—that the representation is false. *See Miller v. Fairchild Indus.,* 97 Md.App. 324, 629 A.2d 1293, 1302 (1993). If the party knows the representation to be false at the time it is made, then the claim is one for *fraudulent* misrepresentation. The elements of fraudulent misrepresentation are: (a) a false representation; (b) made with the knowledge of its falsity, or in reckless indifference to the truth; (c) with the intent of defrauding the person claiming to be injured; (d) justifiable reliance by that person; and (e) damages caused as a result of the fraudulent statement. *Id.* at 1301–02.

■■■ As VW correctly argues, plaintiffs have failed to allege a fraud claim with sufficient particularity under Rule 9(b). *See* Fed.R.Civ.P. 9(b). Plaintiffs have merely alleged that during negotiations regarding the dealerships' possible implementation of the Marketing Standards, VW "gave assurances to the Plaintiffs that an 'open point of sale' located in the Baltimore metro area would not be activated." (Compl.¶ 10.) In their opposition brief, plaintiffs asserted their complaint was sufficient under Rule 9(b) because it allows VW to frame a response to the fraud allegation. At oral argument, however, plaintiffs' counsel essentially conceded the fraud claim was not plead with sufficient particularity. Plaintiffs have failed to provide details of the time, place, and contents of the false representation, as well as the identity of the person making the representation. *See All Risks, Ltd. v. Equitable Life Assurance Society,* 931 F.Supp. 409, 419 (D.Md.1996). Plaintiffs have the capa-

bility to provide the details of the alleged fraudulent misrepresentations and will be given leave to amend their complaint to include these details.

### E.   Injunctive Relief (Count I)

In Count I plaintiffs assert claims for preliminary and injunctive relief. Plaintiffs' entitlement to an injunction stands or falls with their other claims, and Count I asserts no independent basis for relief. It will therefore be dismissed.

A separate order is being entered herewith.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 24th day of March 2003

ORDERED that

1.   Defendant's motion to dismiss is granted with respect to Counts I, II, III, IV, and VI;

2.   Defendant's motion to dismiss is granted with leave to amend for Counts V and VII.