# CECELIA M. BEALL *v.* CARLTON G. BEALL

[No. 50, September Term, 1980.]

*Decided September 11, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Steven Rosen,* with whom were *Willoner, Calabrese & Rosen, P.A.* on the brief, for appellant.

■■■■■■

■■■■■■

*J. Frederick Garner,* with whom were *Lancaster & Garner* on the brief, for appellee.

COLE, J., delivered the opinion of the Court. SMITH and DIGGES, JJ., dissent. SMITH, J., filed a dissenting opinion at page 236 *infra,* in which DIGGES, J., concurs.

In this case we are called upon to decide, after a brief discussion of the reasons a purported option to purchase land does not satisfy the requirements of the statute of frauds, a question of first impression: [1] whether a bare offer by husband and wife to sell land held as tenants by the entirety survives the death of one of the tenants.

We summarize the facts. Calvin and Cecelia Beall were husband and wife, who in 1956 purchased as tenants by the entirety a 1/2 acre parcel of land, from John and Pearl Beall, Calvin's father and mother. The rectangular parcel is the subject of this dispute and is bound on three sides by a much larger plot of land (130 to 145 acres in size), at that time also owned by Calvin's parents and known as the Beall farm. Calvin had worked the Beall farm since leaving high school and had shared the fruits of his labor with his parents.

In February of 1968, Carlton Beall, a second cousin to Calvin, contracted to purchase the Beall farm from Pearl Beall, then widowed. At about the same time, Carlton obtained a written, three-year option to purchase Calvin and Cecelia's parcel for $28,000. This option recited consideration of $100.00 which was paid by check to Calvin. In February of 1971 the parties executed a new option for five years, on the same terms as the first, which again recited consideration of $100.00. Carlton never exercised either option, but in 1975 four lines were added to the bottom of the 1971 agreement which purported to extend it for three additional years. Calvin and Cecelia signed this addendum, which reads as follows:

---

1. Our research has revealed no reported case in the United States or Great Britain which has addressed this issue.

As of October 6, 1975, we, Calvin F. Beall and Cecelia M. Beall, agree to continue this option agreement three more years — February 1, 1976 to February 1, 1979.

/s/ Calvin Beall

/s/ Cecelia Beall

Calvin died in 1977.

In May of 1978, Carlton advised Cecelia by letter that he was accepting the offer to sell and would be in a position to settle within thirty (30) days. Cecelia responded that she was unwilling to sell for $28,000. In September of 1978, Carlton again notified her of his intent to purchase and advised her of the settlement date. Again Cecelia refused and declined to attend the settlement. Thereafter, Carlton filed suit in the Circuit Court for Prince George's County seeking specific performance. That court granted Cecelia's motion to dismiss on the ground that the 1975 agreement was unsupported by consideration and was therefore unenforceable. Carlton appealed to the Court of Special Appeals, which reversed and remanded the case for a new trial directing the circuit court to determine whether there was a valid, unrevoked offer to sell the property in dispute and, if so, whether there was a proper acceptance of that offer sufficient to create a contract specifically enforceable in equity. We granted Cecelia's petition for certiorari to decide the important issues presented.

The first question we must address is whether there arose a binding agreement between Carlton on the one hand and Calvin and Cecelia on the other. An option is a continuing offer to sell by the optionor which cannot be withdrawn by him during the stated period. *Straley v. Osborne,* 262 Md. 514, 278 A.2d 64 (1971); *accord, Diggs v. Siomporas,* 248 Md. 677, 237 A.2d 725 (1968); *Blondell v. Turover,* 195 Md. 251, 72 A.2d 697 (1950). An option is not a mere offer to sell, however, but a binding agreement if supported by consideration. *Blondell v. Turover, supra.* The optionee has

what is termed a power of acceptance, and when he accepts the offer in the prescribed manner, the option is thereby exercised and a binding bilateral contract of sale is created. *Straley v. Osborne, supra.* Moreover, when the optionee indicates his intention to exercise the option and tenders the amount of the purchase price, he has performed under the option and is entitled to specific performance. *Straley v. Osborne, supra; Diggs v. Siomporas, supra; Blondell v. Turover, supra.*

It is conceded in the instant case that the only offer Carlton attempted to accept was the offer made in the extension agreement of 1975. The key, then, to deciding whether Carlton may require Cecelia to convey to him depends upon whether a binding option contract was formed in 1975 or whether, if not, there was nevertheless a valid offer to sell outstanding at the time he attempted to effect his acceptance in 1978.

Cecelia maintains that enforcement of the alleged contract of 1975 is barred by the statute of frauds. The statute is codified in Maryland Real Property Code (1974, 1980 Cum. Supp.), § 5-104, which provides that

> [No] action may be brought on any contract for the sale or disposition of land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing, and signed by the party to be charged or some other person lawfully authorized by him.

An option to purchase land concerns the sale of land and is, therefore, governed by the statute of frauds. *See Fraley v. Null,* 244 Md. 567, 224 A.2d 448 (1966); *Bank v. Hurst Estate,* 187 Md. 333, 50 A.2d 133 (1946). To render a contract enforceable under the statute of frauds, the required memorandum must be

(1) a writing (formal or informal);

(2) signed by the party to be charged or by his agent;

(3) naming each party to the contract with sufficient definiteness to identify him or his agent;

(4) describing the land or other property to which the contract relates; and

(5) setting forth the terms and conditions of all the promises constituting the contract made between the parties.

*Forsyth v. Brillhart,* 216 Md. 437, 440, 140 A.2d 904 (1958); *Sinclair v. Weber,* 204 Md. 324, 332, 104 A.2d 561 (1954). In sum, we have stated that the statute of frauds requires a memorandum for the sale of real estate to contain all the elements of a valid contract. *London v. Riebel,* 189 Md. 376, 379, 56 A.2d 34 (1947). *See Miller v. Herrmann,* 230 Md. 590, 595-96, 187 A.2d 847 (1963).

The chancellor below observed, and we agree, that reference to the various agreements between the parties readily provides most of the elements not contained in the 1975 addendum. The property to be sold was ascertainable; the parties involved were identifiable; the duration of the option was specified; and the purchase price was certain. Thus, the memorandum of agreement, by itself or by reference to earlier agreements, contained all the elements of a valid option contract except one: consideration for Calvin and Cecelia's extension of the offer to sell.

It is fundamental that in order for a contract to be binding it must be supported by consideration. Totally absent from the 1975 memorandum is any recitation of consideration for Calvin and Cecelia's extension of their offer to sell for three additional years. It would appear, therefore, that the memorandum does not fulfill the requirements of the statute and that the underlying agreement is unenforceable. Carlton argues, however, that the extension contract is nevertheless enforceable in his action for specific performance under the equitable doctrine of part performance. He asserts that the consideration for the extension was his forbearance upon exercising his 1971 option, which, in October 1975, was good until February 1976.

It has generally been accepted in Maryland that forbearance to exercise a legal right is sufficient consideration to support a promise. *Erie Insurance Exchange v. Calvert Fire Insurance Co.,* 253 Md. 385, 252 A.2d 840 (1969); *O'Neill v. Frederick Trading Company,* 223 Md. 301, 164 A.2d 537 (1960), and cases cited therein. However, when forbearance is offered as evidence of part performance sufficient to escape the operation of the statute of frauds it must be such as would not ordinarily have taken place in the absence of the alleged contract and therefore is not reasonably explicable on some other ground. If the part performance asserted consists wholly of forbearance to act, the fact is less likely to be evidential in character than when it consists of affirmative action. 2 Corbin, *Contracts* § 430, at 473-74.

This Court has stated that part performance is adequate to remove the bar of the statute of frauds when there is "full and satisfactory evidence" of the terms of the agreement and the acts constituting part performance. *Hall v. Hall,* 1 Gill 383, 393 (1843); *see Serio v. Von Nordeck,* 189 Md. 388, 391-92, 56 A.2d 41 (1947). Furthermore, we have held that the part performance itself "must furnish evidence of the identity of the contract; and it is not enough that it is evidence of *some* agreement, but it must relate to and be unequivocal evidence of the *particular* agreement. . . ." *Semmes v. Worthington,* 38 Md. 298, 326-27 (1873) (emphasis added); *accord, Kline v. Lightman,* 243 Md. 460, 221 A.2d 675 (1966).

Here Carlton offered the following testimony as evidence of his forbearance:

BY MR. GARNER:

Q. Now, Mr. Beall, would you tell the Court, what were the circumstances under which the October 6th, 1975, the four lines on the bottom left-hand corner of Exhibit 9 were signed?

. . . .

A. It was my mutual agreement that the contract be continued, and a mutual agreement of Cecelia as well as Calvin and myself. And this was added

and executed by them to continue this agreement. And for that reason in 19— this — this four lines were written by my wife, she typed it in.

Q. Prior to the execution of the October 6th, 1975 — those four lines on October 6th, 1975, had you expressed your intention to exercise your option?

A. Prior to that, in 1970, I expressed my desire to exercise the option.

Q. Then did you at any time subsequent to 1970 express —

A. In 1975 I expressed my interest in exercising my option.

Q. And to whom did you express that?

A. I expressed it to Calvin and Cecelia.

Q. What was their reaction to that?

. . . .

A. In 1971, Cecelia's reaction was that, let's take — I'm ready to go, let's relocate.

And, of course, in their discussion between them — and I said, "You people decide what you want to do."

The question and the request was that we continue — that I continue the option. And at that point I informed them that I did not have a copy of it, and in order to continue it, if they loaned me their copy I would have it typed so it could be properly executed and we could continue it. And we talked about a period of five years at the time.

And for that reason this was typed by my wife, and was executed, too, that time.

In 1975 Calvin had been sick, and was sick, and the question was could he continue. It was never raised, he was sick.

And I also expressed my interest in this time, should exercise my option that if I still wanted the farm worked and wanted to continue it, and it was by mutual agreement by he and Cecelia that this would be continued. And this was — extension was placed on this agreement, signed by them. And I did not sign it because I didn't see the need for it.

Q. But you agreed to it, did you not?

A. I agreed to it. And they continued to work the farm.

Q. When was that agreement signed, the four lines?

A. October the 6th.

Also adduced at trial was the fact that Calvin had worked this farm from 1956 until 1968, sharing the profits of his labor with his parents. From 1968 until his death, he continued to work the farm for Carlton, relieving him from paying the taxes and all expenses incident to farming. It is not certain, therefore, that Carlton's election to postpone acceptance of the offer was an act which he would not have done in the absence of Calvin and Cecelia's extension of the offer to sell their land. As a matter of fact it is clearly explainable on the ground that he wished Calvin to continue working the farm without regard to his interest in purchasing the subject property.

Since it is uncertain what Carlton's forbearance in fact related to, part performance has not been sufficiently established in order to take the 1975 agreement out of the operation of the statute of frauds. Thus, the purported extension of the option in 1975 was not a binding contract but merely an offer, which could be revoked at any time prior to acceptance. *James L. Kernan Co. v. Cook,* 162 Md. 137, 142, 159 A. 256 (1932).

Carlton argues that, even if the extension agreement was unenforceable as a contract but was merely a bare offer, he accepted this offer before it was withdrawn, thereby creating a binding contract between the parties which the court may

enforce. Apparently what Carlton does not reckon with is the effect of Calvin's death in 1977 upon this offer, based upon the fact that Calvin and Cecelia owned the property in question as tenants by the entirety.

The general rule is that the death of an offeror revokes his offer or causes his offer to lapse. *Chain v. Wilhelm,* 84 F.2d 138 (4th Cir. 1936); *rev'd on other grounds,* 300 U.S. 31, 57 S. Ct. 394, 81 L. Ed. 487 (1937); *Shaw v. King,* 63 Cal. App. 18, 218 P. 50 (1923); *Pratt v. Trustees of Baptist Soc.,* 93 Ill. 475 (1879); *New Headley Tobacco Warehouse Co. v. Gentry's Ex'r,* 307 Ky. 857, 212 S.W.2d 325 (1948); *Jordan v. Dobbins,* 122 Mass. 168 (1877); *Tucker v. Rucker,* 221 Miss. 580, 73 So. 2d 269 (1954); *Wallace v. Townsend,* 43 Ohio St. 537, 3 N.E. 601 (1885); *Helfenstein's Estate,* 77 Pa. 328 (1875); *National Eagle Bank v. Hunt,* 16 R.I. 148, 13 A. 115 (1888); 1 Corbin, *Contracts* § 54; Restatement of Contracts § 48; *Williston on Contracts,* § 62. Death terminates the power of the deceased offeror to act. *Jordan v. Dobbins, supra,* 122 Mass. at 170. Therefore, after death, the formation of that "apparent state of mind of the parties which is embodied in an expression of mutual consent" is rendered impossible. *Chain v. Wilhelm, supra,* 84 F.2d at 140-41.

Cecelia asserts that the offer at issue was made by a single unit, tenants by the entirety, and, that when Calvin died the marriage of Calvin and Cecelia was terminated and operated as the legal death of the offeror, which, according to the long established rule, caused the offer to lapse. Carlton's rejoinder is that the offer to sell was signed by two individuals, each of whom had an interest in the whole, and that while the death of Calvin operated as a revocation of *his* offer to sell and terminated his interest, his death neither (1) terminated the offer made by Cecelia, an offer over which she retained, as an individual and as from the outset, the unrestricted power to revoke; (2) increased her interest, *see Columbian Carbon Co. v. Kight,* 207 Md. 203, 114 A.2d 28, 51 A.L.R. 2d 1232 (1955); nor (3) destroyed her capacity to convey. In other words, Carlton suggests the effect of the death of Calvin was merely to free the estate from his participation. *See Lang v. Commissioner,* 289 U.S. 109, 53 S. Ct.

534, 77 L. Ed. 1066 (1933), *affirming* 61 F.2d 280 (4th Cir. 1932). Such a view, however, flies in the face of common law principles regarding the nature of an offer and the attributes of an estate held by the entirety.

Maryland retains the estate of tenancy by the entirety in its traditional form. *Columbian Carbon Co. v. Kight, supra.* By common law, a conveyance to husband and wife does not make them joint tenants, nor are they tenants in common; they are in the contemplation of the law but one person, and hence they take, not by moieties, but by the entirety. Neither can alienate without the consent of the other, and the survivor takes the whole. *Marburg v. Cole,* 49 Md. 402, 33 Am. Rep. 226 (1878); *accord, McManus v. Summers, Admx.* (No. 17 (Adv.), Sept. Term, 1981, filed June 3, 1981); *State v. Friedman,* 283 Md. 701, 393 A.2d 1356 (1978). Tenancy by the entirety may not be severed by the consent of one of the parties or by their individual judgment creditors during their joint lives; except in the case of absolute divorce, during the lifetime of both tenants their estate may be terminated only by the joint action of both and a conveyance by both to a third person. *Eastern Shore Bldg. & Loan Corp. v. Bank of Somerset,* 253 Md. 525, 253 A.2d 367 (1969).

While the individual interests of each will be protected by a court of equity under appropriate circumstances, *see, e.g., Colburn v. Colburn,* 262 Md. 333, 278 A.2d 1 (1971), *on appeal after remand,* 265 Md. 468, 290 A.2d 480 (1972) (wife entitled to one-half the income from property held by the entireties), when a husband and wife act together with respect to property held as tenants by the entirety, they are required, under traditional legal principles, to be of one mind. Calvin and Cecelia signed a 1975 addendum not in their purely individual capacities but as a team. They acted together in making but a single offer to convey. The correct focus, then, is not upon the individual powers and capacities of Calvin and Cecelia with respect to their survivor interests, but upon the powers and capacities of each in their respective roles as tenants by the entirety.[2]

---

**2.** This approach is conceptually dissimilar to that proffered by Mrs. Beall, although both approaches lead to the same conclusion. Her approach

With respect to the nature of an offer, it has been held that:

> The continuation of an offer is in the nature of its constant repetition, which necessarily requires someone capable of making a repetition. Obviously this can no more be done by a dead man than a contract can, in the first instance, be made by a dead man. [*Pratt v. Trustees of Baptist Soc., supra,* 93 Ill. at 478-79.]

Viewing the offer of tenants by the entirety as being made by a team rather than the two individuals who make up this team provides a solution in the instant case. The continuation of an offer made in this fashion depends upon the continuous assent of both tenants, for neither can continue an offer to sell without the continued assent of the other. Here, in the absence of consideration to support an option, the vitality of the offer made by Calvin and Cecelia depended upon the continued assent of each; upon Calvin's death, his assent was no longer viable. Hence, the offer lapsed upon the death of Calvin Beall. After his death, one of two events was necessary to the formation of a contract in the instant case: (1) a renewal by Cecelia of the lapsed offer to sell, which offer was accepted by Carlton Beall, or (2) an offer to buy made by Carlton, which offer was accepted by Cecelia. Neither of the above sequences of events took place. We conclude that when Carlton sent his letter of acceptance in May of 1978 there was no viable offer for him to accept. Calvin's death had effectively caused the offer to lapse. We hold, therefore, that no enforceable contract was formed between the parties.

---

focuses on the fiction of "oneness" and enables the analysis to proceed as though the offer had been made by the tenancy itself. Were divorce instead of death the triggering event, however, we fear Mrs. Beall's approach might lead to anomalous results. Thus, our adoption of the "team" approach is as much occasioned by practical considerations as it is upon theory. Nevertheless, the fact that each had an interest in the whole, as opposed to only part, is one of the features which distinguishes this case from Ritchie v. Rawlings, 106 Kan. 118, 186 P. 1033, 1035 (1920), which involves an offer to distribute the proceeds of an estate in a manner different from that provided in the will, and holds that acceptance of an offer must be communicated during the life of all the parties.

On balance we conclude that this result not only comports with principles of law, but also serves the interests of equity. Upon Calvin's death, the original reasons, economic and otherwise, why Calvin and Cecelia chose to offer their land for sale to Carlton Beall were no longer applicable. The needs of Calvin and Cecelia, as of any married couple, may not necessarily coincide with the needs of Cecelia alone, as a widowed spouse. More important, Cecelia's responsibilities, both legal and personal are vastly different today. For example, the rights of her individual creditors, if any, may now attach to the subject property, which, before Calvin's death, could only be attached by the creditors of both. In view of such changed conditions, at least some of which would pertain in the case of every widowed spouse, we think that to hold a surviving widow to the terms of an unsupported offer to sell property held by the entirety, made jointly with her husband before his death, would not be in the interests of equity.

For the above reasons the judgment of the Court of Special Appeals is reversed.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court with instructions to affirm the judgment of the Circuit Court for Prince George's County.*
>
> *Appellee to pay the costs.*

*Smith, J., dissenting:*

The rationale for the doctrine that death of an offeror revokes an offer is found in 1 *Restatement of Contracts* § 48 (1952), and 1 A. Corbin, *Contracts* § 54 (1963). The *Restatement* states:

"§ 48. *Termination of Offer by Offeror's Death or Insanity.*

A revocable offer is terminated by the offeror's death or such insanity as deprives him of legal capacity to enter into the proposed contract.

*Comment:*

*a.* The death or insanity of the offeree also in effect terminates a revocable offer because it thereby becomes impossible to accept it. . . ."

Professor Corbin says on the subject:

**"§ 54. Effect of Death or Insanity on Power of Acceptance**

It is very generally said that the death of the offeror terminates the offeree's power of acceptance even though the offeree has no knowledge of such death. Such general statements arose out of the earlier notion that a contract cannot be made without an actual meeting of minds at a single moment of time, a notion that has long been abandoned. The rule has also been supposed to follow by some logical necessity from the dictum that it takes two persons to make a contract. It is not contrary to that dictum to deny that death terminates power to accept; the offer was made by a living man and is accepted by another living man. One and one make two. The rule has also been explained on the ground that the surviving offeree intended to contract with the deceased offeror and can not be forced into relations with a personal representative, a different person. This explanation is not applicable in case the surviving offeree is the one who is insisting on the validity of the contract. It is somewhat more plausible if it is the surviving offeree who is defending against the contract. He accepted in reliance on the promise and credit of a specific living person, and the shift to those of a personal representative may be materially disadvantageous.

In practically all cases, however, the accepting offeree is sufficiently protected by the rule that makes any contractor's duty constructively conditional on the ability of the other party to render substantially in full the agreed exchange for which the offeree bargained. If the offeror's personal representative can sufficiently assure the performance of this condition, there is little reason for refusing to enforce the contract against the offeree. He is in the very position that he would occupy if the offeror's death had occurred the moment after acceptance instead of just before it. In either case, if the personal representative is unwilling or unable to render the agreed exchange substantially in full, the promises made by the offeree will not be enforced against him." *Id.* at 227-28.

A similar view is expressed in 1 S. Williston, *Contracts* § 62 (3d ed. W. Jaeger 1957):

"Assuming that the formation of a contract required mutual mental assent of the parties, and offer and acceptance were merely evidence of such assent, it would be obviously impossible that a contract should be formed where either party to the transaction died before this assent was obtained. That such assent was formerly thought necessary seems probable, and as to death, this theory is still maintained. Accordingly, it is generally held that the death of the offeror terminates the offer." *Id.* at 206-07.

Given the fact that the wife in this instance was a party to the offer and that the entire title is now vested in her by operation of law, I can see no logical reason for holding that she is not bound by *her* offer.

In determining whether to extend this rule, so criticized by Professor Corbin, to a tenancy by the entirety situation, the majority might wish to ponder the origin of the tenancy by the entirety concept. Phipps, *Tenancy by Entireties,* 25 Temp. L.Q. 24 (1951), states:

"A species of common-law concurrent ownership, tenancy by the entireties developed as part of the English feudal system of land tenures. The exigencies of feudalism demanded that the functions of ownership be vested in males, presumably capable of bearing arms in war. Women were lightly regarded legally, and especially married women — whose very identities, in most respects, were considered merged and lost in the personalities of their husbands. For purposes of property and of contract, the married woman was under a complete legal blackout termed coverture. Man and wife were one and the one was male.

"One result was that titles to land taken in the name of a wife and titles which she brought with her into marital status were subject immediately to the husband's exclusive dominion and control, by virtue of his rights *jure uxoris;* and marriage amounted to an absolute gift of all the wife's personal property to the husband.

"*A fortiori,* titles taken in the names of both husband and wife were subject to the exclusive control of the husband during the marriage. At common law a transfer of title to the husband and wife was a transfer to an entirety and unity under the husband's dominion, since both the spouses were regarded together as one. The result was tenancy by the entireties — wherein neither spouse held any respective interest or share, and upon the death of one, the whole estate still belonged as before to the survivor." *Id.* at 24-25.

Moreover, 2 *American Law of Property* § 6.6 (A.J. Casner ed. 1952), says on the subject:

"Much valid criticism has been leveled against the estate by the entirety. It is an anachronism in that the married women's property acts have almost completely obliterated the hypostasis which was the common law basis for the creation of the

estate. Moreover, it has many practical disadvantages. There is great uncertainty as to how the tenancy may be created. It is unsuited to situations where the separate rights of each spouse must be enforced, and tends in such cases to produce unreasonable and even antisocial results. It affords too great an opportunity to frustrate the rights of the creditors of one spouse. Even tax advantages, once inherent in estates by the entirety, are now largely ephemeral.

"The social undesirability of the consequences attendant upon the estate by the entirety are readily apparent. Even ostensibly desirable ends, such as depriving an improvident spouse of the opportunity of dissipating the family's entire wealth or enabling a husband and wife to have the advantage of the right of survivorship, may best be achieved in other ways. Improved homestead laws, more extensively used community property systems, and tenancies in common with remainder to the surviving spouse are all methods calculated to secure the advantages which might inhere in an estate by the entirety, without its concomitant disadvantages. It has, therefore, been proposed that the tenancy by the entirety be abolished wherever it still exists. *With this proposal we agree." Id.* at 32 (emphasis added).

Given the original rationale for the rule, Professor Corbin's criticism of the rule, Dean Phipps' view of the origin of the tenancy by the entirety concept, and the view of such a responsible group as the editors of *American Law of Property* that tenancy by the entirety should be abolished, I am unwilling to endorse the majority opinion. I would hold that the offer survived the death of one of the tenants by the entirety and hence the widow is bound.

Judge Digges authorizes me to say that he concurs in the views here expressed.