**In re E.SPIRE COMMUNICATIONS, INC., et al., Debtors.**

**e.Spire Communications, Inc., et al., Plaintiffs,**

v.

**Morris Plumbing & Electric Co., Inc., Defendant.**

**Bankruptcy No. 01–974 JWV.
Adversary No. 02–01418.**

United States Bankruptcy Court, D. Delaware.

May 9, 2003.

Linda Richenderfer, Saul Ewing LLP, Wilmington, DE, for Debtors and Debtors–in–Possession.

Allen Wendelburg, Stone Mill, Hockessin, DE, William E. Holland, Valdosta, GA, for Morris Plumbing & Electric Co., Inc.

### MEMORANDUM OPINION [1]

JERRY W. VENTERS, Bankruptcy Judge.

Before the Court is the Complaint of e.Spire Communications, Inc., *et al.* ("Debtors") against Morris Plumbing & Electric Co., Inc. ("Morris"). The matter was set for trial and heard by the Court on Tuesday March 4, 2003.[2]

## I. BACKGROUND

### A. Procedural History

The Debtors have undertaken extensive litigation in order to sort out purported mechanic's liens asserted against the proceeds from the sale of the Debtors' assets. There were two separate actions that involved the Defendant Morris.

Action 1 was filed by Debtors on January 14, 2002. In that action, the Debtors are seeking (a) a declaratory judgment to determine the extent, validity and priority of Morris' claims against the Debtors, including but not limited to, a judgment against Morris that it does not have a valid perfected security interest in any assets of the Debtors; (b) payment of amounts due to the Debtors by Morris; (c) damages based on alleged fraud by Morris; (d) disallowance of proofs of claim filed by the defendant; and (e) damages for breach of contract [Doc. No. 1 (02–1418) ].

Action 2 was filed on July 10, 2002, against some 50 defendants who hold purported mechanics' lien claims against various properties of the Debtors. The Debtors subsequently filed an amended complaint against all defendants. The Debtors are seeking essentially the same relief as in Action 1, excluding a claim for fraud, against multiple defendants, including Morris [Doc. No. 5 (02–4692) ].

Morris filed answers and counterclaims in both actions alleging (a) breach of contract; (b) fraud; (c) quantum meruit; (d) unjust enrichment; and (e) attorney's fees. The Debtors subsequently moved to dis-

---

1. This opinion constitutes the findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(B), (E) and (K).

miss the Morris counterclaims. By Memorandum Order [Doc. No. 18] dated November 14, 2002, the Court consolidated all issues in Action 2 [02–4692] pertaining to Morris into the present proceeding, Action 1 [02–1418]. On November 20, 2002, the Court issued a Memorandum Order denying the Debtors' motion to dismiss the counterclaims [Doc. No. 23]. The Court entered a Scheduling Order on December 23, 2002 [Doc. No. 29], whereby a trial was set for March 4, 2003.

Throughout the course of the litigation the parties have had numerous problems regarding discovery and discovery related issues. In fact, on the eve of trial it was brought to the Court's attention that a possible key witness, Roger Tate (a former employee of the Debtors), was unavailable because he had disappeared. For this reason, the Court Ordered that all other evidence would be heard on the trial date and Morris would be allowed until March 20 to locate Tate and depose him. Roger Tate was not found and deposed, therefore the evidence submitted at trial was the complete record. The parties submitted post-trial briefs in support of various legal contentions on which the parties relied, in particular those relating to the validity of the Morris lien.

Due to the procedural history of this action, the Court has before it an amalgam of pleadings as follows: (1) Complaint in Action 1; (2) Answer in Action 1; (3) Complaint in Action 2; and, (4) Answer and Counterclaim in Action 2. Since this is confusing at best, the Court has decided it will adjudicate the issues raised at trial for which evidence was submitted without binding itself to the structure of the pleadings. These issues are as follows: (1) the settlement reached between the parties; (2) restoration and warranty costs the Debtors allege they are owed from Morris; (3) the validity and extent of Morris' purported mechanic's lien; (4) the fraud claim asserted by the Debtors; and (5) the allowance or disallowance of Morris' Proofs of Claim.

## B. Facts

Morris was a general contractor that entered into a Master Work Agreement with the Debtors to build the infrastructure for a fiber optic network around Atlanta, Georgia. Morris was responsible for directional boring, or digging trenches for the network to be placed underground. The Debtors eventually fell behind in payments and ultimately had many outstanding purchase orders unpaid. There has been a dispute over whether the parties entered into a settlement on November 27, 2001, whereby the Debtors agreed to pay $2,167,366.05 to Morris as a "true-up" of all then-outstanding purchase orders. The settlement was allegedly evidenced by an e-mail from Mike Miller of the Debtors to D.L. Morris, Jr. ("Buddy Morris") of Morris Plumbing. In return, Morris agreed that it would continue to work on the network. However, the Debtors did not make the settlement payments as quickly as Buddy Morris wanted and on December 11, 2001, Morris filed a mechanic's lien in the amount of $3.4 million in Fulton County, Georgia [Debtors Ex. 6].

## II. DISCUSSION

### A. Morris' Mechanic's Lien

■ The purported mechanic's lien must be analyzed under Georgia state law since the filing was in Fulton County, Georgia, and the work was performed in the State of Georgia. First, § 44–14–361 of the Georgia Code provides a list of persons that "shall each have a special lien on the ... property for which they furnish labor, services, or materials ...." Ga.Code Ann. § 44–14–361(a).

Section 44–14–361.1 outlines the requirements to "make good the liens specified in paragraphs (1) through (8) of subsection (a) of Code Section 44–14–361." Ga.Code Ann. § 44–14–361.1(a). Subsection (a) further provides:

[The liens] must be created and declared in accordance with the following provisions, and on failure of any of them the lien shall not be effective or enforceable: (1) A substantial compliance by the party claiming the lien with his contract for building, repairing, or improving . . . (2) The filing for record of his claim of lien within three months after the completion of work . . . in the office of the clerk of the superior court of the county where the property is located, which claim shall be in substance as follows:

"A.B., . . . contractor . . . or other person (as the case may be) claims a lien in the amount of (specify the amount claimed) on the [property] and the premises or real estate on which it is erected or built, of C.D. (describing the houses, premises, real estate, or railroad), for satisfaction of a claim which became due on (specify the date the claim was due) for building, repairing, improving, or furnishing material (or whatever the claim may be)."

At the time of filing for record of his claim of lien, the lien claimant shall send a copy of the claim of lien by registered or certified mail or statutory overnight delivery to the owner of the property or the contractor, as the agent of the owner. . . .

Ga.Code Ann § 44–14–361.1(a).

In summary, a purported lien holder must show: (1) substantial compliance with the contract; (2) filing within three months after completion of work; (3) the name of the contractor; (4) lien amount claimed; (5) property the lien attaches to; (6) a description of the property; and (7) the date(s) the amounts were due. In analyzing the lien [Debtors' Ex. 6], the Court finds that Morris has not met all of the requirements set forth in § 44–14–361.1, and therefore his purported mechanic's lien is void.

First, the lien was filed in Fulton County but not all of the work performed by Morris was in Fulton County, and there is insufficient evidence for the Court to break down the Fulton County and non-Fulton County work. Ronald J. Kormas, the Debtors' vice president of construction on the Atlanta project, testified to several purchase orders ("POs") for work that was performed outside of Fulton County [Tr. at 73–75]. In his testimony, Mr. Kormas outlined over ten POs for work that was performed in Cobb and Dekalb Counties [Tr. at 74–75]. Since there is no way of allocating work actually performed in Fulton County, the Court cannot find that the lien is sufficient.

Second, the lien was filed for an amount well in excess of the amount actually owed and which Morris knew was actually owed, in violation of the statute. The lien as filed asserts that the Debtors owe Morris $3.4 million, which is $2,355,748.59 over the amount actually owed by the Debtors to Morris. Morris knew the $3.4 million was an inflated number, particularly in view of the $2.167 million settlement he had entered into just a couple weeks earlier.

Finally, Morris failed to show that Morris Plumbing had filed a notice of commencement as required by Ga.Code Ann. § 44–14–361.1(a)(3). Subsection (a)(3) requires that within 14 days after filing an action, the party claiming a lien must file a notice with the clerk of the superior court of the county wherein the subject lien was filed. The purpose is to notify any parties who may have an interest in the property or have their own lien on the property.

Although the statute clearly requires a notice, there is no evidence that such a notice was filed. The notice is particularly important here since the claim on the lien was·filed in a Delaware federal court, rather than in Georgia state court. ·Therefore, the lack of statutorily required notice is a fatal flaw in the lien asserted by Morris and renders it unenforceable.

The Debtors also assert that the legal description of the property in the lien fails to adequately identify the property under state law. But there appears to be no test of what constitutes a sufficient description, other than a loose standard—if the description can lead to an identification of the property. *See Mull v. Mickey's Lumber & Supply Co., Inc.*, 218 Ga.App. 343, 461 S.E.2d 270, 273 (1995). Mr. Kormas, in his testimony, linked the locations in the lien to specific purchase orders [Tr. at 73–76] which could be construed as evidence that the descriptions were sufficient since he could tell where the properties were located. Therefore, the Court makes no finding as to the validity of the property descriptions as set forth in the purported lien since we hold that the lien is invalid on other grounds.

For· all of these reasons, the Court finds that the mechanic's lien filed by Morris in Fulton County, Georgia, fails to meet the requirements of Ga.Code Ann. § 44–14–361.1 and is therefore invalid.

**B. The November 27, 2001, Settlement**

■ The Court is mindful of the proposition that settlement has long ·been a favored method of resolving disputes. However, what constitutes a settlement can vary greatly depending on the facts and circumstances of each case. A settlement must at the very least meet the basic requirements for a contract. In this regard, "it is well established that forbearance to exercise a legitimate right or claim is sufficient consideration to support a [settlement] agreement." *David v. Warwell*, 86 Md.App. 306, 311 586 A.2d 775 (1991), *quoting, Beall v. Beall*, 291 Md. 224, 230 434 A.2d 1015 (1981).[3]

■ The purported settlement reached on November 27, 2001, between Morris and the Debtors was clearly a settlement of all previously unpaid invoices due and owing at that time. Counsel for Debtors and Morris admitted on the record that the parties agreed on a settlement of all obligations, excluding projects called "Iron Horse", up to that time, through the November 27 "true up" [Tr. at 44, 46, 48].[4]

The record indicates that during the course of negotiating the settlement, the parties conducted a "walking audit" [Tr. at 77]. The walking audit entailed walking that portion of the network that Morris ˙had built and comparing each section to each PO submitted [Tr. at 77]. As a result of the walking audit and further negotiations, the parties were able to reconcile all obligations and amounts owed at that time and draft one PO that reflected the settled amounts. Purchase Order Number 2106, dated November 27, 2001, states that the amount due and owing by the Debtors to Morris was $2,167,367.00 [Debtors' Ex. 12, Tr. at 95]. Furthermore, the parties also agreed at trial that an e-mail, dated November 27, 2001, sent by Mike Miller of the Debtors to Morris Plumbing, evidenced that a settlement was reached in the amount of "2.167M" [Morris Ex. 2]. The parties also agreed by e-mail on No-

3. Article 9 of the Master Work Agreement between the parties states that Maryland law is applicable [Debtors' Ex. 1].

4. The Debtors also admitted in the Complaint in Action 1 that there had been a settlement reached [Complaint at ¶ 18].

vember 27, 2001, that Iron Horse was excluded from the settlement [Morris Ex. 2].

Therefore, the Court finds that there was a settlement of all previously unpaid invoices based on the evidence presented and admissions by the parties at trial. The settlement was a result of lengthy negotiations between the parties, most notably the walking audit, and should be honored by the Court. The amount that Debtors owed as a result of the settlement is $2,167,367.00, as evidenced by admissions by the parties, witness testimony, and PO Number 2106.

The scope of the settlement remains at issue. Specifically at issue are: (1) the amounts under the settlement that remain due and owing by the Debtors; (2) whether amounts due for "rock adder" were included in the settlement; (3) any amounts due and owing by the Debtors for "Iron Horse"; and, (4) whether any amounts remain due and owing by Morris to the Debtors for restoration or warranty work that Debtors had to perform. The Court will discuss each settlement issue in order.

## 1. Settlement Amount Owed By Debtors

Buddy Morris testified that the amount remaining to be paid by the Debtors on the settlement is $1,044,000 [Tr. at 147]. Specifically, on December 11, 2001, the Debtors sent a letter to Morris and NAS Surety. Morris' bonding company, whereby the Debtors stated that they had paid $1,253,114.64 of the $2,167,366.05 settlement amount [Morris Ex. 4; Tr. at 148]. These payments left a balance of $914,251.41 outstanding and unpaid by the Debtors [Morris Ex. 4]. Included in these payments were two payments to Morris by the Debtors on November 15 and 20, 2001, totaling $130,000 [Tr. at 147–48]. Since the $130,000 in payments predate the settlement of November 27, they cannot be considered as payments toward the settlement amounts owed by the Debtors.

Based on the foregoing, the Court finds that the Debtors still owe $1,044,251.41 on the settlement. That total takes into account the settlement amount of $2,167,366.05, minus the $1,253,114.64 paid by the Debtors, and minus the $130,000 in payments that predate the settlement.

## 2. Rock Adder

During the course of building its portion of the network, Morris would encounter rock or rock formations which had to be specially bored through. The cost of boring through the rock was an extra $45 per foot, which was in addition to what was being paid for the directional bore work [Tr. at 43]. This additional cost is referred to as "rock adder." The Debtors assert that the amounts Morris charged for rock adder were not part of the settlement. The Debtors argue this because they also contest the amounts that Morris charged for the rock adder work. Morris alleges that POs for rock adder were included in the settlement and thus the Debtors cannot refute those amounts now.

The Court agrees with Morris. The Debtors' own witness, Ronald Kormas, who was vice-president of construction during the building of the network, admitted that rock adder was part of the settlement. In discussing the reconciliation of amounts while negotiating the settlement, Mr. Kormas stated:

> [T]here were some pay sheets that had rock adders added ... w[h]ere the original pay sheets didn't show rock adder, but there was (sic) some other ones that came up later that did have rock adder. Roger [Tate] confirmed that those were ones that he signed off on. So we started adding those back in. Once we got all the rock adder sheets in, it totalled 1.6 and some change [Tr. at 78].

Similarly, Buddy Morris testified that "we [the parties] went over every fee owed" [Tr. at 142]. Therefore, the Court finds that amounts attributable to rock adder were included in the November 2001 settlement between the parties. The Debtors cannot enter into a settlement of all outstanding amounts and then seek to change those amounts post-settlement. The Debtors are not entitled to $1,375,110 for rock adder [Debtors' Ex. 10].

### 3. Iron Horse

The building of the network in certain sections at times required boring under streams and other natural obstacles. In order to complete these sections Morris contracted out to a company named Iron Horse International that had the equipment to do the special boring. The work done by Iron Horse International and any amounts the Debtors owed simply became known as "Iron Horse" between the parties. As previously stated, the amounts due for Iron Horse were not included in the settlement and were to be paid outside of the settlement [Tr. at 48]. Morris alleges that it is still owed $234,297 for Iron Horse [Tr. at 48]. Based on the testimony at trial and a letter from the Debtors, the Court cannot agree with Morris.

On February 12, 2002, Buddy Morris, as President of Morris Plumbing, sent a letter to the Debtors requesting payment of the balance owed on Iron Horse [Debtors' Ex. 20]. Attached to the letter is a statement of invoices for Iron Horse work and amounts that had been paid up to that time by the Debtors. The statement provides as follows: (1) $290,340.00 in gross amounts due; (2) $236,144.53 in payments made by the Debtors; and, (3) a total balance due of $54,195.47 [Debtors' Ex. 20].

At trial, Morris asserted that it was still owed $243,297.30 for Iron Horse. Morris offered into evidence a summary [Morris Ex. 5] of the Iron Horse charges and payments which Buddy Morris had prepared the day before trial. Because he was unable to find copies of two checks that the Debtors had issued on Iron Horse, Morris contended those payments had not been made, and thus the remaining balance was $234,297.30.

The Court places greater reliance on the February 12 letter and its itemization of the Iron Horse charges and payments, and discounts the summary prepared immediately before trial by Morris. The February 12, 2002, letter was prepared shortly after the settlement of all other matters was reached by the parties in November 2001, and was explicit in its detailing of the charges submitted to the Debtors and the payments received by Morris. It is therefore more likely to be accurate than a summary that was prepared more than a year later for the purpose of bolstering Morris' position at trial.

Furthermore, Buddy Morris' own testimony on the Iron Horse payments discredits his position at trial. Buddy Morris admitted that Morris did in fact prepare the February 12 letter [Tr. at 185], and he could not explain why the February letter stated a different balance than the summary [Tr. at 186]. The Court finds Buddy's testimony and the summary offered by Morris to be unreliable and not credible.

For these reasons, the Court finds that the total amount remaining due and owing by Debtors for Iron Horse is $54,195.47.

### C. Amounts Owed to Debtors for Restoration/Warranty Work

The Debtors allege that they are entitled to monies from Morris for restoration, or warranty, work that the Debtors had to perform to correct Morris' work. According to Section 7.1 of the Master Work

Agreement, the Debtors had the right to seek payment under the warranty for up to one year after the date of final payment [Debtors' Ex. 1]. During the course of construction, after contractors completed their work on the various parts of the network, the Debtors would have to inspect the work performed to ensure it met with the appropriate standards for operation. Where problems had occurred with the work performed, the Debtors would hire contractors to perform "dig-ups" and other restoration work to fix any deficiencies [Tr. at 96–97]. Also, since parts of the network were on public property the Debtors had to repair any damage done to the property as a result of the contractors' work. For example, the Debtors were responsible for repairing sidewalks and curbs and filling potholes that were left by the original contractors [Tr. at 99]. The repairs were necessary to the Debtors because the public entities withheld permits until the damages were repaired [Tr. at 99]. Each contractor was primarily responsible for repairing any defects or damages that occurred as a result of its work.

The Debtors kept a bill-back accounting sheet, which is a record of all amounts the Debtors paid contractors to do restoration and corrective work and then how those amounts are attributable to each original contractor that initially performed the work [Tr. at 97–98]. The amount listed on the Debtors' bill-back accounting sheet for Morris is $1,669,207.11 [Debtors' Ex. 14]. Thus the amount attributable to each original contractor was "billed back" to each contractor. Morris presented no evidence at trial to rebut the Debtors' contentions. The Court finds that the Debtors are entitled to $1,669,207.11 as the Debtors' records reflect in the bill-back accounting sheet.

### D. Fraud

· The Debtors allege in Count Three of the Complaint that "Morris made intentional false statements to the [Debtors] regarding, *inter alia*, the amount due and owing to Morris" [Complaint at ¶ 46]. The Complaint further alleges that "Morris knowingly, willfully and intentionally made such misrepresentations in order to fraudulently induce [the Debtors] into paying additional amounts that were clearly not due to Morris" [Complaint at ¶ 48]. The Complaint does not explain in what context the fraud arose or what payments were a result of Morris' fraudulent behavior. During the course of the trial, it became apparent that the Debtors were alleging that Morris had charged for rock adder work that Morris did not perform [Tr. at 43] and for which the Debtors paid through the settlement, which Morris did not perform [Tr. at 43] in the amount of $1,375,110 [Tr. at 91].

▄▄▄ According to Georgia law [5], in order to recover in an action for fraud a plaintiff must show: (1) a false representation was made by the defendant; (2) which the defendant knew was false (scienter); (3) made with an intent to deceive the plaintiff; (4) justifiable and detrimental reliance by the plaintiff on such representation; and (5) damages suffered by the plaintiff as a result of the misrepresentation. *See* O.C.G.A. § 51–6–2; *In re Williams*, 282 B.R. 267, 272 (Bankr. N.D.Ga.2002), *GE Life and Annuity Assur, Co. v. Barbour*, 191 F.Supp.2d 1375,

---

**5.** Generally, for tort claims, Georgia follows the choice of law doctrine *lex loci delictis*. *Int'l Business Machines Corp. v. Kemp*, 244 Ga.App. 638, 640, 536 S.E.2d 303, 306 (2000). According to *lex loci delictis*, "tort cases are governed by the substantive law of the place where the tort or wrong occurred." *Id.; See also Wardell v. Richmond Screw Anchor Co.*, 133 Ga.App. 378, 380, 210 S.E.2d 854, 856 (1974). The Court presumes that the alleged fraud occurred in Georgia and will therefore apply Georgia law.

1383 (M.D.Ga.2002). The burden of proof is on the allegedly defrauded party, who "must prove actual, not constructive, knowledge on the part of the defendant." *See Jackson v. Paces Ferry Dodge, Inc.*, 183 Ga.App. 502, 504, 359 S.E.2d 412, 414 (1987). "Where there is no evidence of scienter, that is, that the false statement was knowingly made with false design, there can be no recovery." *Day v. Randolph*, 159 Ga.App. 474, 475, 283 S.E.2d 687, 688 (1981).

■ The evidence submitted at trial does not warrant a finding of fraud on the part of Morris. There was testimony that the Debtors hired an independent company to perform a "rock audit" in January 2002, after becoming suspicious that they had overpaid for rock adder work [Tr. at 80–92]. Mr. Kormas testified that the rock audit was conducted by digging holes every half-mile over the suspect portion of the network to determine if there was rock and rock was only found ten percent of the time [Tr. at 121]. The rock audit is essentially the entire basis for the Debtors' fraud claim.

The Debtors offered no evidence at trial showing that Morris knew there was no rock and induced the Debtors into settlement based on fraudulent amounts due and owing. There were hints at trial that at least one of the Debtors' employees (Roger Tate) acted in complicity with Morris in some sort of scheme to defraud the Debtors on charges for rock adder, but nothing conclusive was offered by the Debtors as to a conspiracy involving its own employees and Morris. Therefore, the Court finds that the Debtors are not entitled to judgment on the Count Three fraud claim.

### E. Objections to Morris' Proofs of Claim

The Debtors assert in Count Four of the Complaint an objection to the Proofs of Claim filed in the bankruptcy case against the Debtors [Complaint at ¶¶ 52–54]. The claim objection asks that Morris' Proof of Claim be expunged in its entirety since no amounts are due to Morris [Complaint at ¶¶ 53–54]. Based on the findings already made by the Court, *supra*, Morris is entitled to an allowed claim in the amount of $1,098,446.88 for the amounts still due and owing from the Debtors. But the Court has also found in favor of the Debtors for the restoration/warranty work they had to perform totaling $1,669,207.11. Due to the conflict in amounts owed on both sides, and a desire to avoid duplicative or circular litigation, the Court will reconcile the amounts owing on both sides in the context of the Debtors' claim objection. The Court interprets Count Four as seeking to assert a right of recoupment in defense of the claim asserted by Morris through its Proofs of Claim.

■ Section 558 of the Bankruptcy Code provides:

> The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statute of limitations, statutes of frauds, usury, and other personal defenses. A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.

11 U.S.C. § 558 (2003). Courts have held that § 558 preserves to the Debtor defenses it would have had prepetition. *In re PSA, Inc.*, 277 B.R. 51 (Bankr.D.Del.2002)(holding that debtor, under § 558, was entitled to exercise state law right of setoff); *In re Papercraft*, 127 B.R. 346 (Bankr.W.D.Pa.1991)(finding that either setoff or recoupment is available as a defense under § 558 and, if established, results in netting out of what each party owes the other). The Court finds § 558

wholly applicable to the present proofs of claim issue.

Next, the Court must determine whether a defense in the form of a right to setoff or recoupment is available under Maryland law. Maryland recognizes both setoff and recoupment and has defined these concepts as follows:

> " 'recoupment' means a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of the same transaction on which the adversary's claim is based; 'setoff' means a diminution or a complete counterbalancing of the adversary's claim based upon the circumstances arising out of a transaction other than that on which the adversary's claim is based . . ."

See *Imbesi v. Carpenter Realty Corp.*, 357 Md. 375, 380, 744 A.2d 549, 552 (Md.2000). Thus, where the "[debtor] seeks compensation from the [creditor] for damages resulting from the same transaction upon which the [creditor]'s claim is based, his claim is one for recoupment . . ." See *First Nat'l Bank of Maryland v. Shpritz*, 63 Md.App. 623, 638, 493 A.2d 410, 418 (Md. Ct.Spec.App.1985). Recoupment is basically a common law remedy arising out of the same contract which forms the initial cause of action (or proofs of claim as is the case here). *Billman v. State of Maryland Deposit Ins. Fund Corp.*, 88 Md.App. 79, 93, 593 A.2d 684, 690 (Md.Ct. Spec.App.1991). The *Billman* case provides a thorough history of recoupment in Maryland that the Court finds instructive to the present issue. The Court of Appeals, quoting an 1849 case, explained:

> "Recoupment is a species of common law setoff for damages due the defendant, growing out of the same transaction. It is allowed in actions . . . to avoid circuity of action. The doctrine of recoupment is comparatively modern, but it has become settled law in this State. The tendency of modern decisions has been to avoid circuity and multiplicity of actions, by allowing matters growing out of the same transaction [to be asserted] by way of defence . . ." (internal citations omitted)

See *Billman*, 593 A.2d at 690–691, quoting *Milburn v. Guyther*, 8 Gill 92, 93, 1849 WL 3198 (1849)(at reprint 73).

The Debtors have met the requirements for asserting a right of recoupment against Morris' Proofs of Claim. The Proofs of Claim and the claims asserted in this proceeding arise out of the same transaction—the Master Work Agreement originally entered into by the Debtors and Morris [Debtors' Ex. 1]. The Master Work Agreement created the relationship between the parties and is the common thread linking all proofs of claim, causes of actions, counterclaims and defenses.

Furthermore, the interests of judicial economy and convenience for the parties are met by allowing a right of recoupment by the Debtors. By ruling on Morris' Proofs of Claim, the Court and the parties will avoid the "circuity of action" that would result from leaving the claims to be handled through the claims process.

For these reasons, the Proofs of Claim filed by Morris Plumbing are extinguished and expunged and the Debtors are entitled to a judgment in the amount of $570,760.23. The amount of the judgment is a result of the $1,669,207.11 owed by Morris for restoration work, minus $1,098,446.88 owed by the Debtors on the settlement.

### III. *CONCLUSION*

For the foregoing reasons, the Court holds: (1) Morris' alleged mechanic's lien filed in Fulton County, Georgia, is invalid as a matter of law; (2) the Debtors owe

Morris $1,044,251.41 for settlement amounts that remain due and owing; (3) amounts charged for rock adder work were included in the settlement; (4) the Debtors owe Morris $54,195.47 for Iron Horse amounts; (5) Morris owes the Debtors $1,669,207.11 for restoration work paid for by the Debtors; (5) Morris owes the Debtors $570,760.23 after all amounts owed between the parties are reconciled; and (6) Morris' Proofs of Claim are disallowed.

The Parties shall submit a form of order to the Court within ten (10) days.